Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Ave, 7ᵗʰ Floor
New York, New York 10177
Phone: (212) 300-5358
Fax: (888) 265-7054

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

| | |
|---|---|
| YESH MUSIC, LLC, | Case No.: 20-cv-2639 (AMD)(JO) |
| Plaintiff, | **ECF CASE** |
| v. | **FIRST AMENDED COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT** |
| OUTPOST INC., ECHO BAY MEDIA, INC., SCOTT WILSON, ANDRE DUPUIS, JASON GREENBERG, and JAZZ POULIN, | |
| Defendants. | |

---------------------------------------------------------------x

Plaintiff YESH MUSIC, LLC, by and through the undersigned counsel, brings this First

Amended Complaint and Jury Demand against defendants OUTPOST INC. ("OUTPOST"),

ECHO BAY MEDIA, INC. ("ECHO BAY"), SCOTT WILLSON ("WILSON"), ANDRE

DUPUIS ("DUPUIS"), JASON GREENBERG ("GREENBERG"), and ZAZZ POULIN

("POULIN") for damages based on direct copyright infringement, contributory infringement, and

related claims pursuant to the Copyright Act and Copyright Revisions Act, 17 U.S.C. §§ 101, et

seq. ("the Copyright Act" or "Act"), passing off, and false designation of origin under the

Lanham Act, 15 U.S.C. § 1125(a), and violations of the Digital Millennium Copyright Act, 17

U.S.C. §§ 1201-05 ("the DMCA").  Plaintiff alleges below, upon personal knowledge as to itself,

and upon information and belief as to other matters so indicated.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1338(a) (jurisdiction over copyright actions).

## SPECIFIC JURISDICTION

2.      CPLR § 302 (a)(3) authorizes this Court to exercise jurisdiction over nondomiciliaries who commit a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if it: (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

3.      At bar, defendants are nondomiciliaries residing or headquartered in Ontario, Ca.

4.      Defendants infringed, directly and indirectly, two or more of plaintiff's copyrighted tracks: (i) *First Day*, (ii) *Second Sight*, (iii) *Call*, (iv) *The Slow Wait (Part Two)*, (v) *Distance to Gibraltar*, (vi) *Frontier Melt*, (vii) *Lights Dim*, and (viii) *Signaling Through The Flames (Ambient)* (the "Copyrighted Tracks"), among many others, from Ontario; these are torts committed outside the state.

5.      Defendants OUTPOST, ECHO BAY, WILSON, DUPUIS, and GREENBERG were put on notice by plaintiff, multiple times, that their copying, distribution, public display, contributory infringement, and/or synchronization of plaintiff's Copyrighted Tracks was unlicensed, and the plaintiff was domiciled in this state.  Defendants elected to continue to infringe after each notice.

6.      Defendants engaged in a scheme to hide the infringing activity by submitting to plaintiff irrelevant and fraudulent post-infringement created records.  Defendants then threatened plaintiff's prosecution of the within matter based on the irrelevant and falsified records.

7.      Each of the defendants knew, at all times relevant to this First Amended Complaint, that they had no authority to exploit the Copyrighted Tracks in any manner, and knew the Copyrighted Tracks were owned by plaintiff.

8.      Defendants knew, or should reasonably have expected, their acts to have consequences in this state.

9.      The Copyrighted Tracks at issue here were used by defendants for financial gain and/or promote their products, services, and overall company, and for the sole purpose of enriching defendants while simultaneously harming plaintiff.

10.      Each of the defendants derive substantial revenue from interstate or international this state.  Each of the defendants has substantial contact with this forum such that there are no due process concerns.

11.      Each defendant, as described in detail below, directly or indirectly, infringed two or more of the Copyrighted Tracks to each defendants' individual page(s) on United States companies like Facebook and YouTube.   Infringing synchronized copies of the Copyrighted Tracks are still active on the U.S. based servers of the U.S. companies.

12.      Each of the defendants has substantial ties to this state and this Judicial District.

13.      Defendant OUTPOST distributes its magazine internationally, and substantially all of its revenue is generated from international commerce.

14.      Defendant OUTPOST has employees in this Judicial District, including its authors Colin Quinn, Arthur Schultz, and Mateo Askaripour who reside and work in Brooklyn.

15.     A significant number of defendant OUTPOST's articles are directed to New York, and it derives significant revenue from New York.

16.     Defendant OUTPOST committed the torts of copyright infringement as well as fraud directed to this Judicial District.

17.     Defendants ECHO BAY, WILSON, and DUPUIS frequently film in and around New York City.

18.     Substantially all of defendants ECHO BAY, WILSON, and DUPUIS clients are from the United States including National Geographic, Cooking Channel, Bravo, Travel Channel, Gusto, Rogers, and many more.

19.     Defendants ECHO BAY, WILSON, and DUPUIS committed the torts of copyright infringement as well as fraud directed to this Judicial District.

20.     Defendant GREENBERG contracted with plaintiff in this state, and substantially all of his revenue is generated from musical content owned and/or managed by individuals and entities in this state, and throughout the United States.

21.     Defendant POULIN ran an international business called Luxury Retreats and leveraged his infringement of two of the Copyrighted Tracks to sell his company to U.S. company AIRBNB, Inc. which maintains a corporate headquarters in New York.

22.     Each of the defendants regularly do or solicit business, or engage in any other persistent courses of conduct, or derive substantial revenue from goods used or consumed or services rendered, in the state.

23.     This Court is conferred with specific jurisdiction over defendants pursuant to CPLR §§ 302(3)(i) and (ii).

## VENUE

24.     A plaintiff may bring a case in: "(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. . . ; or, (3) if there is no district in which an action may otherwise be brought . . . a judicial district in which any defendant is Infringing  to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b)(1)-(3).

25.     At bar, a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

## DUE PROCESS

26.     There are no due process concerns in light of the fact that each of the defendants committed intentional torts that they knew would have an effect in this Judicial District.

27.     As described above, each of the defendants frequently contract with companies in this Judicial District such that they reasonably knew they may be haled into this forum.

## PARTIES

28.     Plaintiff YESH MUSIC, LLC is a New York limited liability company with a headquarters located at 75-10 197th St, 2nd Floor, Flushing, NY 11366.

29.     Upon information and belief, defendant OUTPOST INC. is a foreign company with a headquarters located at 250 Augusta Ave, Toronto, ON M5T 2L7, Canada.

30.     Upon information and belief, defendant JASON GREENBERG is an individual and resides at 151 Charles St W. Kitchener, Ontario N2G, CA.  Defendant GREENBERG also claims to work in Ontario and Los Angeles, CA.

31.     Upon information and belief, defendant ECHO BAY MEDIA, INC. is a foreign company with a headquarters located at 270 Sherman Ave N #223, Hamilton, ON L8L 6N4, Canada.

32.     Defendant ECHO BAY was founded and is owned by defendants WILSON and DUPUIS.

33.     Upon information and belief, defendant SCOTT WILSON is an individual and resides in Ontario, Canada.  WILSON can be served at 270 Sherman Ave N #223, Hamilton, ON L8L 6N4, Canada.

34.     Upon information and belief, defendant ANDRE DUPUIS is an individual and resides in Ontario, Canada.  DUPUIS can be served at 270 Sherman Ave N #223, Hamilton, ON L8L 6N4, Canada.

35.     Upon information and belief, defendant JAZZ POULIN is an individual and resides at 5530 Saint-Patrick St., Montreal, Quebec H4E 1A8, Canada.

## FACTS

36.     Plaintiff is the sole beneficial owner by assignment of all rights to over one hundred forty four (144) original musical compositions and recordings including the ones at issue here titled: (i) *Second Sight* -- U.S. Copyright Registration No. SR 713-241, (ii) *First Day* -- U.S. Copyright Registration No. SR 708-490, (iii) *Call* -- U.S. Copyright Registration No. SR 713-281, (iv) *The Slow Wait (Part 2)* -- U.S. Copyright Registrations No. SR 713-280, (v) *Distance to Gibraltar* – SRu 1-232-320, (vi) *Frontier Melt* – SR 713-276, (vii) *Lights Dim* -- U.S. Copyright Registrations No. SR 713-284, and (viii) *Signaling Through The Flames (Ambient)* – U.S. Copyright Registration No. 713-208. See **Exhibit 1.**

37.     Defendant OUTPOST is an international travel magazine.  Defendant OUTPOST created two videos that synchronized the Copyrighted Tracks *Second Sight*, *First Day*, *Call*, and *The Slow Wait (Part 2)* -without a license or authority to do so.

38.     Defendant GREENBERG is the founder and CEO of Soundscape Media, Inc. ("Soundscape").  Soundscape functions as a licensing agent, but defendant GREENBERG controls every aspect of Soundscape such that Soundscape has no independent function.

39.     Defendant GREENBERG took control of all of plaintiff's Copyrighted Tracks and gave or licensed them to himself, his friends, and other clients without the authority to do so. When caught, defendant GREENBERG, in collusion with defendants OUTPOST, ECHO BAY, WILSON, and DUPUIS created fraudulent licenses in an attempt to cover up the defendants' infringements.

40.     Defendant GREENBERG infringed all of the Copyrighted Tracks, as well as many others.

41.     Defendant ECHO BAY is an editing and post-production company owned by defendants WILSON and DUPUIS.  Defendants WILSON, and DUPUIS colluded with defendant GREENBERG to submit fraudulent licenses to plaintiff to cover up their infringements.  The fraudulent documents were then adopted by defendant OUTPOST.

42.     Defendants ECHO BAY, WILSON, and DUPUIS infringed all of the Copyrighted Tracks, as well as many others.

43.     Defendant POULIN created a video that he uploaded to YouTube and his corporate website that synchronized two Copyrighted Tracks *Lights Dim* and *Frontier Melt* without license or authority.

44.     Defendant POULIN knew at all times that he did not have the authority to publish the infringing video with the Copyrighted Tracks.

## OUTPOST INFRINGEMENTS

45.     In or about August 2019, defendant OUTPOST retained defendant ECHO BAY for the editing and post-production of its "Peru series".

46.     Defendant OUTPOST paid defendant ECHO BAY a mere $400.00 for this service because the job was not significant nor time intensive, requiring only a few hours of work.

47.     One of the four videos in the "Peru Series" that defendant ECHO BAY edited, on behalf of its client defendant OUTPOST, is titled "In From The Outpost with Jeff Fuchs Ep 1 The Salkantay Trek" ("Infringing Video One").

48.     Without a license, defendant ECHO BAY on behalf of defendant OUPOST copied, and synchronized plaintiff's Copyrighted Tracks: (i) *Call*, (ii) *Second Sight*, and (iii) *First Day* to Infringing Video One.

49.     On or about September 5, 2019, defendant OUTPOST distributed and publicly displayed, without a license, the Infringing Video One, with the unlicensed synchronized Copyrighted Tracks (i) *Second Sight*, (ii) *First Day*, and (iii) *Call*, by posting Infringing Video One to defendant OUTPOST's YouTube page, the Outpost Magazine, and In From The Outpost websites located at:

   i.    defendant OUTPOST's website "In From The Outpost" located at
         <https://outpostmagazine.com/infromtheoutpost/>;
   ii.   defendant OUTPOST's international online magazine located at
         <https://outpostmagazine.com/infromtheoutpost/>; and,
   iii.  defendant OUTPOST's  YouTube page at
         <https://www.youtube.com/watch?v=O-bWXiI5aL0>.

50.     As of the date of this First Amended Complaint, all three uploads of Infringing Video One are active and available to the public.

51.     Defendants WILSON and DUPRE are personally liable due to the fraudulent attempt to cover up defendants OUTPOST's and ECHO BAY's infringements.

52.     Defendants OUTPOST, and its agent defendants ECHO BAY, WILSON, DUPUIS and GREENBERG infringed plaintiff's rights to the Copyrighted Tracks (i) *Second Sight*, (ii) *First Day*, and (iii) *Call* pursuant to Section 106 of the Act.

53.     Defendant OUTPOST created, with the assistance of its agent defendants ECHO BAY, WILSON, DUPUIS and defendant GREENBERG, a second infringing video in the "Peru Series" titled "In From The Outpost with Jeff Fuchs Ep 2 Time with the Chawaytiri" ("Infringing Video Two")(together both videos are referred to as the "OUTPOST VIDEOS").

54.     Defendant ECHO BAY, on behalf of defendant OUTPOST, synchronized the Copyrighted Track *The Slow Wait (Part Two)*, without a license or authority, to Infringing Video Two.

55.     On or about September 5, 2019, defendant OUTPOST distributed and publicly displayed the Copyrighted Track *The Slow Wait (Part Two)* by posting Infringing Video Two to defendant OUTPOST's YouTube page, and the Outpost Magazine, and In From The Outpost websites located at:

     i.    defendant OUTPOST's YouTube page located at
           <https://www.youtube.com/watch?v=I2Vga6-zajQ>;
    ii.    defendant OUTPOST's website "In From The Outpost" located at
           <https://infromtheoutpost.com/episode-2-time-with-the-chawaytiri/>; and,
   iii.    defendant OUTPOST's international online magazine located at
           <https://outpostmagazine.com/infromtheoutpost/>.

56.     Defendant OUTPOST also posted a link to the OUTPOST VIDEOS on its social media pages including Facebook, Twitter, and Instagram pages. See, e.g.

https://www.facebook.com/Outpostmagazine/posts/episode-2-of-in-from-the-outpost-with-jeff-fuchs-explorer-jeff-fuchs-heads-to-th/10156907648655686/; and,

https://www.instagram.com/outpostmagazine/?hl=en.

57.    The OUTPOST VIDEOS were uploaded to defendant OUTPOST's YouTube, Instagram, Twitter, and Facebook pages, all companies are based in the United States.

58.    The OUTPOST VIDEOS were then hosted on a United States based network of server farms located in: Dallas, Oregon; Atlanta, Georgia; Reston, Virginia; Lenoir, North Carolina; Moncks Corner, South Carolina, Forest City, North Carolina, Lulea, or Altoona, Iowa.

59.    By delivering the OUTPOST VIDEOS to numerous U.S. companies to be stored on U.S. servers makes defendant OUTPOST's infringements United States based.

60.    As of the date of this First Amended Complaint, the OUTPOST VIDEOS are active and available to the public.

61.    The four Copyrighted tracks should have been covered by two licenses with three Copyrighted Tracks in the cue sheet on one license and one Copyrighted Track in the Cue Sheet of the second license.

62.    Defendant GREENBERG, however, clandestinely provided the four Copyrighted Tracks to defendant OUTPOST through its agent defendant ECHO BAY and defendants WILSON and DUPUIS leaving no record of the transactions and paying no compensation to plaintiff.

63.    On May 18, 2020, plaintiff served defendant OUTPOST by email with notice that that there was no license for its copying, distribution, public display, and/or synchronization of each of the Copyrighted Tracks (the "May 18 Notice"). **Exhibit 2.**

64.     By email dated May 19, 2020 defendant OUTPOST's editor-in-chief replied:

> Hello, this was forwarded to my office. Before I forward you email, please
> send thru details of what content you're referring to? **We always (always!)
> follow music copyright protocols for our content, and have purchased
> rights for songs/music for certain projects, and yes can prove that**.
> Therefore, if you could provide details on what content you're referring to,
> we can follow up accordingly. Thanks and I await your reply.

**Exhibit 2**.

65.     While defendant's Editor-in-Chief in her May 19, 2020 email adamantly insisted

defendant always (and always was repeated twice) follows proper protocols for licensing

"songs/music", defendant OUTPOST did not produce a single valid license.

66.     Defendant OUTPOST clearly represented that it always follows protocols and

purchased the four Copyrighted Tracks and purchased the rights to the Copyrighted Tracks –

and "yes [it] can prove that".  Yet defendant OUTPOST did not produce any licenses at that

time.

67.     In fact, it would be months before defendant OUTPOST produced the fraudulent

licenses created by defendant GREENBERG in collusion with defendants WILSON, DUPUIS,

and ECHO BAY.

68.     By email dated May 20, 2020 from defendant OUTPOST's Editor-in-Chief,

defendant OUTPOST stated:

> Thank you. **I will forward this to the appropriate person**, and he will be
> in touch with you. **As far as I am aware, all the music for our Peru
> series followed proper licensing protocol** (as I said, we are very careful
> as a media company on this). It may take a day to get back to you, but you
> don't hear from us within a few days, please do email again. And I will
> ensure someone follows up with. Thanks for getting in touch.

**Exhibit 2**.

69.     There also were no "licensing protocols" followed by defendant OUTPOST.  This was all part of the cover-up.

70.     Defendant OUTPOST's President responded by email several hours later on May 20, 2020 stating:

> On May 20, 2020, at 1:27 PM, Matt Robinson <matt@outpostmagazine.com> wrote:
>
> Hello there and thank you for your note. All licenses to the music you have referred us to "Ep 2 Time with the Chawaytiri" - https://www.youtube.com/watch?v=I2Vga6-zajQ - have been properly purchased through our post production partners and there catalogue relationships. I have forwarded your note to them and they will forward the license details as soon as they have an opportunity to do so. Please keep in mind that the COVID situation has most people working from their homes and it may take a little longer then usual to hear back. Thank you for getting in touch. Cheers, Matt
>
> *President, Outpost Travel Media*
> *416-972-6527*
>
> matt@outpostmagazine.com
> outpostmagazine.com
> tanyourmind.com
> infromtheoutpost.com

**Exhibit 3**.

71.     Defendant OUTPOST's story changed in a matter of hours.  It went from "as far as I am aware the music was licensed" to the music was "properly purchased".  Defendant OUTPOST had no licenses to refer to, or other document, it simply relied on its agent defendant ECHO BAY.  When plaintiff requested the identity of defendant OUTPOST's unnamed post-production partner – defendant OUTPOST refused to respond.

72.     Defendant OUTPOST took no steps to produce the purported licenses it repeatedly assured plaintiff would be produced.

73.     Defendant OUTPOST's claimed in the two May 20, 2020 emails that it: (i) could prove everything was licensed, and (ii) the licenses would be produced.  These statements were objectively false statements.

74.     Defendant OUTPOST claimed it informed defendant ECHO BAY and Soundscape twice of the within dispute on or about May 20, 2020: (i) "Thank you. I will forward

this to the appropriate person", and (ii) "I have forwarded your note to them, and they will

forward the license details".

75.     From the above it can be assumed that defendant OUPOST had no protocols, nor

did it have any licenses.

76.     Plaintiff was not contacted and received no licenses.  **Twenty-four (24) days** later

the Complaint in this matter was filed on June 14, 2020.

77.     Almost one month later, still no licenses were produced.  Then, by email from

defendant GREENBERG dated July 14, 2020 he stated:

> Hello Richard and John,
>
> We have received a message from one of our clients that there has been a
> court filing for copyright infringement for the usage of your music. **This
> comes as a big surprise to all parties involved as we have issued a
> proper license for this usage, and nobody was contacted regarding
> this matter previous to this filing**.
>
> . . . the usage of your music in the Outpost Magazine production is a
> legitimate one.
>
> I have CC'd Outpost Magazine on this email . . ..

See **Exhibit 4** (emphasis added).

78.     Still no licenses were produced.

79.     By email dated July 14, 2020, counsel for plaintiff responded to defendant

GRREENBERG in pertinent part as follows:

> Now you claim "usage of your music in the Outpost Magazine production
> is a legitimate one", but have not produced a license.  Nor does my client
> have any record of any royalty payment from Soundscape in the relavant
> period.  Provide a contemporaneous relevant license, and proof my client
> was paid for said license, and we will consider this matter resolved.

See **Exhibit 5**.

80.     Defendants OUTPOST, ECHO BAY, WILSON, DUPUIS, and GREENBERG did not produce licenses or any documentation supporting defendant GREENBERG's claim that defendant OUTPOST's uses of the Copyrighted Tracks was "legitimate".

81.     By two emails dated September 1, 2020, defendant OUTPOST adopted the fraud and insisted the fraudulent documents were sufficient to excuse the infringements. See **Exhibit 6**.

82.     For almost four (4) months defendant OUTPOST could not produce any licenses, then it somehow obtains licenses.  Defendant OUTPOST knew, or should have known, the licenses were fraudulent.

83.     Defendant OUTPOST received the two different versions of the May 14, 2019, and still insisted the documents were authentic.

84.     Numerous additional demands were made to defendant OUTPOST to cease and desist, yet defendant OUTPOST continued to infringe the Copyrighted Tracks.  To the date of this First Amended Complaint, defendant OUTPOST has refused to disable the OUTPOST VIDEOS.

85.     The OUTPOST VIDEOS were created in August 2019, but plaintiff has no record of any of defendant OUTPOST's or its agent defendant ECHO BAY's uses of plaintiff's Copyrighted Tracks.

86.     Defendant OUTPOST's agent defendant ECHO BAY and defendants WILSON and DUPUIS materially colluded with defendant GREENBERG on the intentional infringements and created fraudulent documents and licenses in an attempt to cover-up defendant OUTPOST's infringements.

## THE FRAUDULENT DOCUMENTS

87.     Defendant OUTPOST gave the four Peru Series videos to defendant ECHON

BAY for editing and post-production in August 2019.

88.     Defendant OUTPOST paid defendant ECHO BAY a total of $400.00 to edit and

post-produce all four videos in the Peru Series.

89.     The $400.00 fee reflects the fact that the task of editing and post-production took

a few hours and was not complicated.

90.     Plaintiff has been informed that it would have taken less than well-under one day

in editing and post-production to complete the four Peru Series videos including the two

OUTPOST VIDEOS.  The OUTPOST VIDEOS are short low budget "teasers" posted to

YouTube with an expected audience of under 30,000 in their lifetime.  See below:



91.     Defendants GREENBERG, WILSON, DUPUIS, and OUTPOST disclosed

numerous fraudulent documents including fraudulent licenses in an attempt to cover up the

defendants' infringements.

92.     On July 13, 2020, two months after defendant OUTPOST was first notified of the

infringement, and after the Complaint in this matter was filed and sent to defendant, defendant

GREENBERG on behalf of himself and defendant OUTPOST sent four fraudulent and irrelevant

documents, claiming the documents covered excused the four infringements by defendant

OUTPOST (the "July 13 Disclosure"). See **Exhibit 7**.

93.     Defendant GREENBERG obviously was obviously confident the fraudulent July 15 Disclosure was sufficient to satisfy plaintiff's claims against defendant OUTPOST.

94.     The first document in the July 13 Disclosure is a PayPal statement from 2015. The absolute irrelevancy of a 2015 PayPal statement to cover August 2019 infringements demonstrates the depths of the fraud defendants OUTPOST and GREENBERG were willing to go to in order to cover the August 2019 infringements by defendant OUTPOST.

95.     The second and third documents in the July 13 Disclosure are equally irrelevant.

96.     The second document in the July 15 Disclosure was a fraudulent license dated May 14, 2019 for the Copyrighted Track *The Slow Wait (Part Two).*

97.     The third document was a PayPal statement for the below January 1-June 30, 2019 royalty statement (months before the OUTPOST VIDEOS were edited).  That statement has nothing to do with the four infringements and does not contain any reference to defense OUTPOST's or ECHO BAY's infringements.



98.     Both the second and third documents in the July 15 Disclosures by defendants GREENBERG and OUTPOST were engineered to excuse the obvious intentional fraud of the

four Copyrighted Tracks by defendants OUTPOST, WILSON, DUPUIS, ECHO BAY, and GREENBERG.

99.     The fourth document in the July 15 Disclosure is a purported license from 2015 which is expressly limited by its own terms to a "Webisode" titled "Outpost Columbia". Clearly, a 2015 license for four of plaintiff's tracks (only one of which is at issue here), which can only be synchronized to the Outpost Columbia webisode has no relation to the four infringed Copyrighted Tracks in the two August 2019 Infringing Peru Videos.

100.    Several years prior to the two Infringing Peru Video, defendant OUTPOST did make an Outpost Columbia video with its agent defendant ECHO BAY.  Again, the Outpost Columbia video is irrelevant here.

101.    If the four 2015 Columbia Video only tracks appeared on the 2015 royalty statement, then the one Copyrighted Tracks on the purported 2019 license would also have appeared on the 2019 royalty statement – they do not.

102.    Defendants OUTPOST, WILSON, DUPUIS, ECHO BAY, and GREENBERG were clearly attempting to cover the 2019 infringements by OUPOST with a nonsensical 2015 license.

103.    Despite repeated demands, and a filed and served Complaint, over a four-month period of time, the only documents that defendants OUTPOST, WILSON, DUPUIS, ECHO BAY, and GREENBERG could produce was a fraudulent license for one Copyrighted Track *The Slow Wait (part Two)*, and an irrelevant license for an unrelated video.

104.    None of the six Copyrighted Tracks appear on any legitimate license.

## THE FRAUD EXPLODES

105.    Then, miraculously, on August 4, 2020, months after the first demand was made, four (4) brand new purported licenses between defendant ECHO BAY and Soundscape were somehow located by defendants OUTPOST, WILSON, DUPUIS, ECHO BAY, and GREENBERG. See **Exhibit 8**.

106.    The fact that the four purported licenses were not produced in response to the twelve requests made over three and a half months is telling.

107.    The fact that the four (4) purported licenses were produced only after the Complaint in this matter was served is dispositive of the documents' authenticity.

108.    The four (4) purported licenses between Soundscape and defendant ECHO BAY are dated May 6, 2019, May 12, 2019, May 14, 2019, and July 17, 2019 (the "May-July Licenses").  All four are completely fraudulent.

109.    The four previously undisclosed May-July Licenses cover a ten-week period from May to July. See **Exhibit 8**.

110.    The OUTPOST VIDEOS were not sent for editing until August 2019, and the $400.00 editing job required only a few hours of work.

111.    Further, it is well-accepted in the film industry that editing and post-production on a two-hour Hollywood theatrical is four to twelve weeks.

112.    Defendants OUTPOST, WILSON, DUPUIS, ECHO BAY, and GREENBERG created the May-July Licenses in an attempt to cover up its and defendant OUTPOST's infringing activity.

113.    The four May-July 2019 Licenses were printed in Soundscapes' 2020 current license format.  The 2020 license format differs radically from the license used by Soundscape in May-July 2019. Se **Exhibit 9**.

114.    Astonishingly, defendant GREENBERG produced a purported copy of the May 14, 2019 license he previously disclosed on July 13, 2019.  The two May 14, 2019 licenses should be identical, after all they are copies of the same document – they are, however, radically different. See **Exhibit 10**.

115.    The May 14, 2019 license produced on July 13, 2020 is in the format that defendant GREENBERG used in May 2019.  The May 14, 2019 license produced by defendant GREENBERG on August 4, 2020 meticulously follows Soundscape's new license format.



116.    The fonts, header, format, spacing, quotation format, terms, even the production title are different.

117. The following changes between the May 14, 2019 license submitted on July 13, 2020 and the purportedly same license disclosed by defendant GREENBERG on August 4, 2020 are below.

| Clause | The July 13 Disclosure | The August 4 Disclosure |
|---|---|---|
| Clause 1 | currently titled: **OP created by Producer** | currently titled: Outpost Production |
| Clause 1(c) | Recording/Composition as embodied in the Production, in the form of *negatives* or prints | Recording/Composition as embodied in the Production, in the form of prints |
| Clause 3 | 144 | 144.*00* |
| Clause 9 | licensed by *Soundscape.io* | licensed by *www.Soundscape.io* |
| Clause 9 | Licensor shall be entitled to use an image or clip not exceeding *[ 30 seconds ]* | Licensor shall be entitled to use an image or clip not exceeding **20 seconds** |
| Clause 11 | This Agreement shall *inure* | This Agreement shall *enure* |
| Signature line | *By* | *By* |
| Signature line | Agreed to at soundscape.io on May 14, 2019 | Agreed to at soundscape.io on September 3rd, 2020**, *12:03 Am*** |

**Formatting Differences**

| Format Featured | July 13 Disclosure | August 4 Disclosure |
|---|---|---|
| Header | Aoundscape.I0 | Soundscape Media |
| PRO Cue Sheet Info. | Left justified | Right justified |
| Font | Times New Roman | Arial |
| Quotation marks | Smart quotes | Straight quotes |
| Spacing | One space between Clause | Two spaces between clauses. |
| Clause 1 | *1 line gap between opening and Clause 1* | *4 line gap between opening and Clause 1.* |

118. There are many additional differences between the two fraudulent documents.

119. The two documents should be identical.

120. All four August 4, 2020 fraudulent licenses disclosed by defendant GREENBERG on behalf of defendants OUTPOST, ECHO BAY, WILSON, and DUPUIS follow the current format and style used by Soundscape, not the license format and style used from May-July 2019. See **Exhibit 11**.

121.    The May 14, 2019 license produced on August 4, 2020 follows the exact form

defendant SOUNDSCAPE currently uses. See **Exhibit 11**.

122.    Below is an example of a license issued on September 3, 2020 compared to the

purported license issued on May 14, 2020.



123.    Without any doubt, the May 14, 2019 license produced on August 2, 2020 is a

complete fraud.

124.    Below are all four May-July 2019 Licenses compared to the current Soundscape license.

125.    The four May-July 2019 Licenses conform to the exact same current soundscape license format not the May-July 2019 license format.

Current Format



Four Fraudulent Licenses Format

126.    Defendant GREENBERG created the four May-July 2019 Licenses on behalf of himself and defendants ECHO BAY, WILSON, DUPUIS, and OUTPOST in an attempt to cover up their acts of infringement.

127.    Defendant OUTPOST adopted the fraudulent licenses claiming they were dispositive.  Defendant OUTPOST attempted to capitalize on defendant GREENBERG's subterfuge.

128.    Defendant OUTPOST knew defendant ECHO BAY did not execute any licenses for the complained of uses here.

129.    Defendant OUTPOST knew the sudden appearance of licenses, after months, does not happen.

130.    Defendant OUTPOST had both copies of the May 14, 2019 purported license, yet it still forwarded the licenses to plaintiff seeking to fraudulently induce plaintiff to drop its claims.

131.    It wasn't enough for defendants to intentionally infringe the Copyrighted Tracks, conspire to conceal their clandestine agreements from plaintiff, and deprive plaintiff of its royalties; defendants then created fraudulent documents and threatened it would use them against plaintiff if the claims were not dropped.

132.    None of the May-July 2019 Licenses appear on any royalty statement, and plaintiff was never compensated for the purported licenses.

133.    Defendant OUTPOST represented that unless plaintiff drops its claims it would bring Rule 11 sanctions against plaintiff's counsel and would sue plaintiff's members individually for fraud.  The fraud threat is amazing in light of the fact neither plaintiff nor its members ever made a statement to defendant OUTPOST no less a materially false statement.

134.    These are the bully tactics of conspirators.

135.    Defendant GREENBERG also produced four "User Activity" sheets, claiming the user activity sheets supported its fraudulent position that defendants ECHO BAY and OUTPOST licensed the Copyrighted Tracks for the subject uses. **Exhibit 12**.

136.    As each User Activity repo

137.    Again, the four "User Activity" emails are just a furtherance of defendant GREENBERG's fraud.

| License Date | All Tracks | Download Date | Relevant Track |
|---|---|---|---|
| May 6, 2019 | Stars Align<br>Lights Dim<br>Need<br>Call<br>Starscapes | May 6, 2019 | Call |
| May 12, 2019 | First Day | May 11, 2019 | First Day |
| May 14, 2019 | Slow Wait (Part Two)<br>A Song For You<br>Overcome | May 13, 2019 | Slow Wait (Part Two) |
| July 17, 2019 | Second Sight<br>Second Sight (Live) | July 18, 2019 | Second Sight |

138.    Not one of the above appears on a royalty statement, nor was plaintiff compensated for any of the above.

139.    None of the downloads above contain all of the Copyrighted Tracks used in the Infringing Peru Video One.

140.    Plaintiff received notices of two Activity Reports that one of their songs was downloaded.  Each notice makes it clear that a download is not a license. **Exhibit 13**.

141.    Two of the Copyrighted Tracks in the purported User Activity Reports were downloaded one day before the purported licenses.  This is an impossibility because Soundscape's system prints a license before the user is allowed to download the MP3.

142.    The User Activity reports merely support plaintiff's position that defendant GREENBERG was licensing the Copyrighted Tracks, and many others, without disclosing it to plaintiff.

143.    Defendants OUTPOST, ECHO BAY, WILSON, DUPUIS, and GREENBERG knew when they synchronized, or materially assisted in the synchronization, of the Copyrighted Tracks that there was no license.  Defendants OUTPOST, ECHO BAY, WILSON, DUPUIS, and GREENBERG knew they were infringing, directly or indirectly, when the unlicensed Infringing Peru Videos were uploaded to the various websites.

144.    Defendant GREENBERG engaged in a pattern and practice of dramatically exceeding all authority granted to under the Agreement.  Defendant GREENBERG took control of plaintiff's catalogue of songs in his individual capacity and defendants OUTPOST, ECHO BAY, WILSON, DUPUIS, and GREENBERG attempted to defraud plaintiff with fake documents and irrelevant documents and infringed plaintiff's rights pursuant to Section 106 of the Agreement.

145.    defendants OUTPOST, ECHO BAY, WILSON, DUPUIS, and GREENBERG had the clear intent to infringe, or at the very least reckless disregard to plaintiff's rights, entitling plaintiff to an election of four enhanced statutory damage awards against each defendant pursuant to Section 504(c)(2) of the Act.

146.    As a direct and proximate result of defendants' OUTPOST, GREENBERG, ECHO BAY, WILSON, and DUPUIS' direct and indirect infringement of plaintiff's exclusive

rights to the Copyrighted Tracks as set forth in Section 106 of the Act, plaintiff has incurred

damages, and requests an award of defendants' profits in excess of plaintiff's compensatory

damages, plus plaintiff's losses, costs, pre-and-post judgment interest, and attorneys' fees.

Plaintiff may also elect to recover four (4) enhanced statutory damage awards pursuant to 17

U.S.C. § 504(c)(2) for the willful infringement/reckless disregard of its rights under the Act.

## SOUNDSCAPE LICENSE POLICY

147.     Soundscape's website states:

> For your protection, we generate a license for each batch of songs you
> download from our site. This license lists the name of the project/video
> and the songs downloaded for potential use in that project. This provides
> you with proof of license for each project linking the song titles used for
> each of your video titles. Please maintain this license for your records in
> case you need to prove you've legally obtained the rights to use specific
> songs for your specific projects.

148.     When any recording is downloaded from Soundscape's service, the following

notice pops up from Soundscape's website located at <www.soundscape.io>.



149.     Every licensee must enter the "project/video title".

150.    A license is generated prior to any download in the general form of the license attached as **Exhibit 11.**

**ADDITIONAL ECHO BAY, WILSON, DUPUIS, and GREENBERG INFRINGEMENTS**

151.    Defendant ECHO BAY was hired by third-party Sports Distributors of Canada Ltd. ("Sports Distributors") to edit a video.

152.    Plaintiff discovered the unlicensed synchronization of its Copyrighted Track *Distance to Gibraltar* to the Sports Dist. video.

153.    On August 22, 2019, plaintiff notified Sports that it was using unlicensed synchronized copies of plaintiff's copyrighted tracks.

154.    Sports Dist. did not respond and elected to take no action.

155.    On May 14, 2020, plaintiff notified Sports Dist. again that there was no license.

156.    Once again, Sports Dist. did not respond and elected to take no action.

157.    On May 30, 2020, counsel for plaintiff sent a cease and desist to defendant.

158.    Amazingly, defendant Sports Dist. still did not respond and elected to take no action to a three page, detailed, notice of infringement.

159.    On August 10, 2020, Sports was served with a Complaint.

160.    By email date August 13, 2020, Sports responded through its President Brad Hause, that that there was a purported license.

161.    It took over one year, three notices, and service of a summons and complaint before Sports Dist. produced the purported license.

162.    Once again, the purported license was between defendant ECHO BAY and Soundscape Media Inc.

163.    Defendant GREENBERG colluded with defendants ECHO BAY, WILSON, and DUPUIS to produce another fraudulent license.

164.    As the below shows, the fraudulent 2017 Sports Dist. license follows the current license format not the format used by Soundscape in 2017.

| Fraudulent 2017 Sports License | Current License Format |
|---|---|
| Soundscape Media<br><br>Master Use, Synchronization and Performance License<br><br>This agreement (the "**Agreement**") is entered into the 22nd day of **September**, 2017, is effective on the Effective Date described in paragraph 1(b) of this Agreement, and is between **Echo Bay Media Inc** (the "**Producer**") and **Soundscape Media Inc.** (the "**Licensor**").<br><br>In this Agreement, the term "**Recordings**" means that master recording or those master recordings set out in Schedule "A" hereto, of the musical compositions (the "**Compositions**") embodying the performances of certain performers contracted by Licensor (the "**Performers**") and written by certain composers contracted by the Licensor (the "**Composers**"). | Soundscape Media<br><br>Subscription Master Use, Synchronization and Performance License<br><br>This agreement (the "**Agreement**") is entered into the 3rd day of **September**, 2020, is effective on the Effective Date described in paragraph 1(b) of this Agreement, and is between **Garbarini FitzGerald P.C.** (the "**Producer**") and **Soundscape.io Inc.** (the "**Licensor**").<br><br>In this Agreement, the term "**Recordings**" means those master recordings available for download from the Licensor's on search engine, accessible at https://www.soundscape.io (the "**Site**"), of the musical compositions (the "**Compositions**") embodying the performances of certain performers contracted by Licensor (the "**Performers**") and written by certain composers contracted by the Licensor (the "**Composers**"). |

165.    As a direct and proximate result of defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS' direct and indirect infringement of plaintiff's exclusive rights to the Copyrighted Tracks as set forth in Section 106 of the Act, plaintiff has incurred damages, and requests an award of defendants' profits in excess of plaintiff's compensatory damages, plus plaintiff's losses, costs, pre-and-post judgment interest, and attorneys' fees.  Plaintiff may also elect to recover four (4) enhanced statutory damage awards pursuant to 17 U.S.C. § 504(c)(2) for the willful infringement/reckless disregard of its rights under the Act.

166.    Defendants ECHO BAY, DUPUIS, and WILSON infringed eleven (11) of the Copyrighted Tracks by conspiring with defendant GREENBERG to obtain the Copyrighted Tracks without a license, and then synchronizing them to their television programs Descending and UpRooted, and to their clients OUTPOST and Sports Distributors of Canada Ltd. videos.

167.    Upon information and belief, there are many additional infringements by defendants ECHO BAY, DUPUIS, and WILSON that the defendants have managed to conceal to date.

168.     Defendants ECHO BAY, DUPUIS, and WILSON infringed the Copyrighted Tracks by covering up their infringing activity, with the help of defendant GREENBERG, by creating numerous fraudulent licenses, and then submitting those licenses to plaintiff as authentic.

169.     Defendants DUPUIS' and WILSON's fraudulent acts cannot be protected by the corporate shield of ECHO BAY.

170.     As a direct and proximate result of defendants ECHO BAY, DUPUIS, and WILSON infringements of plaintiff's exclusive rights to the Copyrighted Tracks as set forth in Section 106 of the Act, and their contributory infringement of the Copyrighted Tracks, plaintiff has incurred damages, and requests an award of defendants' profits in excess of plaintiff's compensatory losses, and plaintiff's compensatory losses, plus costs, interest, and attorneys' fees.  Plaintiff may also elect to recover fifteen enhanced statutory damage awards pursuant to 17 U.S.C. § 504(c)(2) of up to $150,000 each, but not less than $30,000 each.

## DEFENDANT GREENBERG'S SELF DEALING

171.     Defendant GREENBERG induced plaintiff into signing an agreement dated January 11, 2011 (the "Agreement") on the misrepresentations that he would use his best efforts to license plaintiff's tracks.  At no time did defendant GREENBERG have any intention of using any effort to license plaintiff's tracks.

172.     Instead, defendant GREENBERG intended to steal plaintiff's tracks and license them or give them away for defendant GREENBERG's individual benefit.

173.     Defendant GREEENBERG in his individual capacity worked as the "Music Provider" on the television show UpRooted.

174.    Defendant GREENBERG gave two of plaintiff's Copyrighted Tracks to himself for use on Uprooted for a nominal fee of $22.00 each.

175.    No license was ever issued.

176.    Again, defendant GREENBERG leveraged the Soundscape catalogue to secure a job for himself and took credit for plaintiff's Copyrighted Tracks.

177.    Defendant GREENBERG runs the purported company Soundscape out of his home, and under such control that there is no independent function of Soundscape.

178.    Defendant GREENBERG obtained work for himself on several television programs, and licensed plaintiff's Copyrighted Tracks to himself for almost nothing.

179.    In actuality, there was no actual license that was negotiated, instead, defendant GREENBERG paid a nominal fee to plaintiff for the television programs, and then claimed the Copyrighted Tracks originated from defendant GREENBERG.

180.    Defendant GREENBERG has his own individual website located at <http://jason-greenberg.com/production.html> which defendant GREENBERG uses to license his work for television, film, and videos (the "Greenberg Website").

181.    The Greenberg Website has five tabs labelled "Music Composition", "Music Production", "Music Licensing", Film/TV Credits", and "Video Reel". See < http://www.jason-greenberg.com/>.

182.    When a prospective client clicks on the "Music Licensing" or "Music Production" tabs, that prospective client is sent to Soundcloud where the user can listen to defendant GREENBERG's compositions, and productions.  The "Film/TV Credits" and "Video Reel" tabs takes the user to a list of defendant GREENGERG's credits and a video.

183.     The "Music Licensing" tab, however, takes the user to Soundscape's website. Soundscape is just a gimmick to protect defendant GREENBERG's frauds and illegal activity.

184.     Defendant GREENBERG, not Soundscape, was the "Music Provider" on various television programs including UpRooted, Descending, and Tripulu.  Defendant GREENBERG licensed plaintiff's Copyrighted Tracks *Chillpoint Break, Second Sight*, *Escapist, Signaling Through The Flames (Ambient), Lights Dim, and Frontier Melt* to himself and reported an average $32.81 for each purported license.

185.     This license rate is well below any purported license of plaintiff Copyrighted Track's.

186.     Defendant GREENBERG was the "Music Provider" for the television show UpRooted with Sarah Sharratt.  Defendant GREENBERG licensed the Copyrighted Tracks *Chillpoint Break, Second Sight* to himself for only $22.00 each.

187.     Again, this license rate is 1/250 of the license rate charged by plaintiff for one year for the two Copyrighted Track's.

188.      Defendant GREENBERG gave plaintiff's Copyrighted Tracks to himself and his friends and charged essentially nothing.

189.     Defendant GREENBERG used the Soundscape library as leverage to secure work for himself.  Defendant GREENBERG essentially gave away plaintiff's Copyrighted Tracks while he collected top dollar fees for his own music.

190.     Defendant GREENBERG cannot use Soundscape to shield himself from his fraudulent and criminal actions.

191.     Defendant GREENBERG also passed off plaintiff's Copyrighted Tracks at issue here as his own on at least seven separate occasions.

192.    The fraudulent scheme of defendants GREENBERG started almost immediately after the Agreement was executed.

193.    On March 18, 2012, defendant GREENBERG wrote to plaintiff by email stating:

> I should also mention that you guys have picked up some licenses recently so look out for a statement with payment after the next pay period.

**Exhibit 14.**

194.    No payment, of course, was received by plaintiff in the next pay period.

195.    Defendant GREENBERG replied by email to plaintiff dated March 28, 2012:

> I don't yet have the details on the licenses as they haven't been completed yet but will be happening.
>
> I will send you what I know when I hear back and when the licenses have been completed.  These things take time as you likely know.

**Exhibit 14**.

196.    When plaintiff requested information regarding the purported licenses mentioned by GREENBERG in his March 18, 2012, defendant GREENBERG changed his story.  When confronted GREENBERG stated the licenses would go through but "these things take a long time". See **Exhibit 14**.

197.    First, no statement was generated for the period January 1, 2013-June 30, 2013.

198.    Second, licenses do not ever take a long time to negotiate.  Plaintiff has negotiated hundreds of licenses, none taking more than a few days.

199.    Third, defendant GREENBERG never paid plaintiff for the purported licenses, or provided the information requested on the licenses.

200.    Defendant GREENBERG has entered into a significant number of secret side-agreements, in his individual capacity and through Soundscape, that defendant GREENBERG

neither informed plaintiff of, nor compensated plaintiff for.  Defendant GREENBERG is the

only one that benefited from the secret licenses.

201.    Plaintiff estimates there are over 400 unreported licenses.

**THE STATEMENTS**

202.    The Agreement states, in pertinent part:

> **Statements and Payment.** Soundscape **shall deliver to Composer a statement of all Net Receipts and all amounts due to Composer**, on at least a semi-annual basis, together with payment of all such amounts, if any, due to Composer for the reporting period in question. For each reporting period, Soundscape shall render its statements and make payment to Composer for amounts due to Composer within 60 days following the end of the applicable reporting period. Notwithstanding the foregoing, Soundscape shall not be required to render a statement to Composer for any reporting period in respect of which Composer is not entitled to receive any Net Receipts. If total payable to Composer is less than $50 CAD in any reporting period then Soundscape shall have the right to withhold the amount payable to Composer until the next reporting period in which the balance is greater than $50 CAD before payment is made.

203.    Soundscape was obligated to deliver a statement of all receipts and amounts due

to plaintiff.

204.    Defendant GREENBERG/Soundscape sent seven royalty reports from January

2011 through July 2020.

| Date Covered | No. of Purported Licenses | Stated Use | Rate | Client |
|---|---|---|---|---|
| Jan 1-June 30 2112 | 4 | Descending Episode 111 Episode 112 Tripulu | $42.96 $50.12 $19.09 X 2 | Echo Bay and GREENBERG |
| July 1-Dec. 31 2012 | 1 | Maax Spas | $90.00 | Echo Bay |
| July 1,-Decc. 31 2013 | 3 | Sports Dist. Videos | $75.00 Each | Echo Bay |
| Jan. 1-June 30, 2014 | 2 | Podcast, or YouTube | $30.00 each | Unknown |

| July 1-Dec. 31, 2015 | 7 | Webisodes | $21.96 each avg. | Echo Bay |
| July 1-Dec. 31, 2016 | 3 | Television Show | $22.00 each | GREENBERG |
| Jan. 1-June 30, 2019 | 3 | Online | $149, $67, $51 | Unknown |

See **Exhibit 15**.

205.    From January 11, 2011 through June 30, 2020, defendant GREENBERG compensated plaintiff for twenty-three purported licenses.   To put this amount in perspective, the last ten licenses for plaintiff's Copyrighted Tracks executed prior to this Amended Complaint average $5,000 for one-year Internet only licenses.

206.    At least seven of the twenty-three purported licenses were to defendant GREENBERG himself for use in projects he was working on in his individual capacity in the music department.

207.    Eleven of the twenty-three purported licenses were to projects run by defendant GREENBERG's employers -- defendants WILSON, DUPUIS, and ECHO BAY.

208.    The five remaining licenses on the statements were to unknown parties and could very well be to defendants GREENBERG and ECHO BAY.

**THE UNREPORTED LICENSES**

209.    After the execution of the Agreement, defendant GREENBERG immediately began giving or licensing the Copyrighted Tracks without reporting it to plaintiff or compensating plaintiff.

210.    Defendant GREENBERG sent automated notices when plaintiff's music was downloaded and being considered for a license:

March 5, 2017          Frontier Melt

| March 5, 2017 | Equinox |
| November 20, 2016 | Near East |
| November 20, 2016 | First Day |

**Exhibit 12**.

211.    Plaintiff was not compensated for any of the purported licenses.

212.    Defendant GREENBERG exploited plaintiff's tracks outside of the Agreement. Nearly all of the revenue generated by defendant GREENBERG's exploitation of plaintiff's tracks, went to defendant GREENBERG.

213.    Defendant GREENBERG has treated Soundscape like his own piggy bank, and used the musical tracks in the Soundscape catalogue, including plaintiff's, as a tool to further enrich defendant GREENBERG.

214.    Soundscape's attorney admitted that the seventh statement with three purported licenses is a fraud and does not represent specific licenses or amounts.

215.    Defendant GREENBERG admitted there were twenty-seven licenses for plaintiff's tracks from January 1, 2019-June 30, 2019. See **Exhibit 16.**

216.    None of these twenty-seven licenses appeared on any statement.

217.    Based on this admission, plaintiff extrapolates that over 400 licenses were never reported, and plaintiff was never compensated for them.

218.    At no time did GREENBERG inform plaintiff's that he was licensing to himself or his friends.

219.    Each unreported, uncompensated license is an infringement of plaintiff's rights pursuant to Section 106 of the Act.  Defendant GREENBERG's acts were with utter disregard to plaintiff's rights entitling plaintiff to enhanced damages pursuant to Section 504(c)(2) of the Act.

220.    Defendant GREENBERG admitted there are significant numbers of unreported licenses.

221.    Defendant GREENBERG, in his individual capacity, elected to defraud the plaintiff by not disclosing the fact that most, if not all, of the reported licenses were to himself and his friends.

222.    Plaintiff confronted defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS with the fact that there were no licenses.

223.    When caught, defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS created at least five wholly fraudulent licenses in attempt to insulate defendants from liability.

224.    Defendants WILSON and DUPUIS have employed defendant GREENBERG I his individual capacity on numerous television programs they created.

225.    In 2008 when defendants WILSON and DUPUIS created a travel television program called Departures, and they hired defendant GREENBERG in his individual capacity to provide the music for the program.

**Descending Infringements**

226.    In 2011, defendants WILSON and DUPUIS created a second television program called Descending.  Again, they hired defendant GREENBERG, in his individual capacity, to be the "Music Provider".

227.    Defendants WILSON and DUPUIS did not hire Soundscape.

228.    Sometime in 2011, defendant GREENBERG, in his individual capacity, gave himself, and his employers defendants WILSON and DUPUIS the master recordings for plaintiff's Copyrighted Tracks: (i) *Escapist,* and (ii) *Signaling Through The Flames* for use in Episode 111 and 112 of Descending.

229.    Defendant GREENBERG took credit for both Copyrighted Tracks in his individual capacity in the television program's general credits.  See below:



230.    After defendant GREENBERG gave plaintiff's Copyrighted Tracks to defendants WILSON and DUPUIS, he directed them to include an attribution in the name of solely of defendant GREENBERG.  The credits which appear on each upload of Episode 111 appears as follows:

231.    The credit which appears on the television show and each upload of Episode 112 of Descending appears as follows:



232.    Defendant GREENBERG was the "Music Provider" in his individual capacity and made deals with himself to provide the Copyrighted Tracks at nominal fees.  Defendant GREENBERG did not issue a license for these Copyrighted Tracks through Soundscape.

233.    For a television show the standard license rate for a television show at approximately $2,000-$4,000 not the $38 and $42 defendant GREENBERG paid.

234.   Defendants GREENBERG elected to copy and synchronize plaintiff's Copyrighted Tracks in his individual capacity as the "Music Provider" on the Descendant program.

235.   Defendant GREENBERG took credit in his individual capacity for the Copyrighted Tracks.

236.   Episode 111 and 112 of Descending appear in multiple places on the Internet, as well as on television.  Defendant GREENBERG allowed the perpetual, unrestricted use of plaintiff's Copyrighted Tracks which would have demanded a very high licensing rate.

237.   Defendant GREENBERG was clearly trying to pass off plaintiff's far more successful Copyrighted Tracks as his own.  Defendant GREENBERG's company Soundscape was not identified at any point, only defendant GREENBERG in his individual capacity.

238.   Had the uses been properly licensed, the standard Soundscape license demands an attribution as follows:

> "Such credit shall be in the following form: [track name][artist name] licensed by Soundscape Media"

239.   This was a distinct plan by defendant GREENBERG whose primary focus was the marketing, and sale of his own compositions and recordings and compositions.

240.   Defendant GREENBERG also gave away plaintiff's Copyrighted Tracks or licensed them for ridiculous low licensing rates.  Defendant GREENBERG simultaneously charged licensing rates for his own music far in excess of the rates charged for plaintiff's.

241.   Plaintiff, and the name of the band The American Dollar never appear on any credit.

242.    Defendant GREENBERG's unlicensed distribution of the Copyrighted Tracks (i) *Escapist,* and (ii) *Signaling Through The Flames* is an infringement of plaintiff's rights pursuant to Section 106 of the Act.

243.    The subterfuge of the transaction, as described below, clearly demonstrates defendants' GREENBERG, ECHO BAY, WILSON, and DUPUIS reckless disregard for plaintiff's rights entitling plaintiff the election of two enhanced statutory damage awards against each defendant, plus attorneys' fees, costs, and pre-and-post judgment interest.

244.    Defendant GREENBERG's passing off of plaintiff's Copyrighted Tracks violates the Lanham Act.

## DEFENDANT POULIN'S INFRINGEMENT

245.    Defendant POULIN hired defendant GREENBERG to provide or compose music for his pilot television program called Tripulu.

246.    Defendant GEENBERG gave plaintiff's copyrighted tracks *Frontier Melt* and *Lights Dim* on the express condition that the pilot was never broadcast in any manner. **Exhibit 17**.

247.    On January 1, 2015, an infringing video was posted by defendant PULION, owner of Luxury Retreats (the "POULION VIDEO").  At no time did defendant POULIN have a license or authority to post the PPOULION VIDEO on his website.

248.    On January 15, 2019, defendant POULIN posted the infringing video titled "Playa Del Carmen, Mexico"  to defendant POULIN's Playa Del Carmen Real Estate's website located at <http://playadelcarmenreal.estate/2019/01/15/playa-del-carmen-mexico/>.

249.     Defendant POULIN also posted the infringing video on YouTube, a United States
based company.  The infringing video is currently stored on YouTube's servers in California or
Arizona.

250.     Defendant POULIN broadcast over YouTube his television pilot Tripulu which
viewed almost 400,000 times.

251.     This is a direct infringement of plaintiff's two Copyrighted Tracks.

252.     Defendant GREENBERG took credit for plaintiff's Copyrighted Tracks by
claiming they were "by Soundscape Media".

253.     Defendant POULIN hired defendant GRENBERG in his individual capacity to write the theme song for Tripulu.  Defendant GREENBERG also gave defendant POULIN plaintiff's Copyrighted Tracks *Frontier Melt* and *Lights Dim* for only $19.09 each.

254.     The royalty statement states the Copyrighted Tracks were not meant for broadcast. See **Exhibit 17**.

255.     Defendant POULIN immediately broadcast the pilot over YouTube infringing plaintiff's rights to the Copyrighted Tracks.

256.     Plaintiff discovered the Tripulu infringement in September 2020 after significant due diligence.

257.     Defendant GREENBERG took credit for plaintiff's Copyrighted Tracks in the Tripulu pilot on YouTube.



258.    Defendant POULIN clearly infringed plaintiff's rights to the two Copyrighted

Tracks and did so with reckless disregard or willful blindness of plaintiff's rights, entitling

plaintiff to enhanced statutory damages pursuant to Section 504(c)(2) of the Act.

259.    Defendant GREENBERG violated the Lanham Act.

## DMCA FACTS

260.    Each of the defendants did not include any identifying information in the

infringing videos which would have allowed plaintiff to identify defendant's use of the

Copyrighted Tracks.  Specifically, the infringing advertisements omit the Copyrighted Tracks'

title, album name, author, label, and copyright owner.  Consequently, the infringing

advertisements did not appear in dozens of searches conducted each year by plaintiff.

261.    Given the opportunity to maintain plaintiff's CMI, defendant OUTPOST included only their agent defendant ECHO BAY in the credits of the OUTPOST VIDEOS.



262.    Similarly, defendants PUOLIN, ECHO BAY, WILSON, and DUPUIS omitted the CMI when they created and/or posted the infringing videos.

263.    Each of the defendants refused to stop distributing and/or publicly displaying the infringing videos after multiple notices.

264.    Defendants' removal and/or failure to include any copyright management information after notice is a violation of 17 U.S.C. § 1202 – the DMCA.  Plaintiff is entitled to up to $25,000 for each violation of the DMCA pursuant to Section 1203 of the DMCA.

**DAMAGES**

265.    The last ten (10) license agreements plaintiff has entered for the Copyrighted Tracks, and similar tracks, were for an average of $5,000 each for a one-year Internet only license.

266.    Defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS, have infringed the Copyrighted Tracks well beyond just Internet use.  Each of the licenses associated with these infringements would have been substantially more.

267.    Defendants have made substantially more than plaintiff's compensatory damages.

268.    Defendant POULIN leveraged the infringements to sell his business.  Plaintiff is entitled to all revenue directly, and indirectly, related to defendant POULIN's infringements.

269.    Defendant GREENBERG has leveraged the infringements of plaintiff's rights to secure lucrative individual jobs for himself.

270.    Defendants ECHO BAY, WILSON, and DUPUIS have leveraged the infringements to secure lucrative jobs for themselves, and to enhance their own projects.

271.    Defendant OUTPOST has refused to stop infringing because the OUTPOST VIDEOS are at the core of its business marketing.

272.    With respect to plaintiff's election of statutory damage awards, all defendants (except POULIN) have refused to cooperate with plaintiff, hidden the infringements from discovery, and created fraudulent documents in an attempt to excuse the infringements.

273.    The calculation of each statutory damage award includes:

   i.    Each of the defendants' state of mind at all times was to infringe, and then cover the infringements once caught (with the exception of POULIN).
   ii.   The expenses saved, and profits earned, by the defendants was substantial and can only be calculated accurately at the trial of this matter.
   iii.  The revenue lost by the plaintiff are the lost license fees calculated at a minimum of $5,000 per Copyrighted Track for the three years prior to filing, plus an additional amount for any non-Internet use.
   iv.   The deterrent effect on the defendants is substantial.  Defendants have defied numerous notices and attempted to fraudulently cover-up the infringements once caught.
   v.    The defendants lack of cooperation in providing evidence concerning the value of the infringing material and the disastrously poor conduct and attitude of the defendants warrants a substantial increase in any statutory damage award.

274.     Based on the forgoing, only an award near the top of the statutory scale for each infringement is necessary.

### FIRST CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT
#### (Against All Defendants)

275.     Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

276.     It cannot be disputed that the plaintiff has a valid, registered copyrights, and owns all rights to the Copyrighted Tracks.

277.     Defendants without authority from plaintiff, reproduced, distribute, publicly displayed, and/or synchronized plaintiff's Copyrighted Tracks.

278.     Defendants created and displayed the infringing advertisements for the sole purpose of commercial gain.

279.     Defendants' use of the Copyrighted Tracks was not for criticism, comment, news reporting, teaching, scholarship, or research.

280.     Defendants' use was not transformative.

281.     Defendants elected to reproduce, synchronize, and/or distribute plaintiff's Copyrighted Tracks, using the entirety of each track, without a license.

282.     As a direct and proximate result of defendants' infringement of plaintiff's exclusive rights to the Copyrighted Tracks as set forth in Section 106 of the Act, plaintiff has incurred damages, and requests an award of defendants' profits in excess of plaintiff's compensatory losses, and plaintiff's compensatory losses, plus costs, interest, and attorneys' fees.  Plaintiff may also elect to recover statutory damage awards for each registration which is

enhanced pursuant to 17 U.S.C. § 504(c)(2) for willful infringement/reckless disregard of up to

$150,000, but not less than $30,000.

## SECOND CLAIM FOR RELIEF
## FALSE DESIGNATION OF ORIGIN/PASSING OFF
## LANHAM ACT - 15 U.S.C. § 1125(a)
## (Against Defendant Greenberg Only)

283.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if

set forth here at length here.

284.    The Copyrighted Tracks originated with the plaintiff.

285.    Defendant GREENBERG claimed the origin of the Copyrighted Tracks was

falsely designated by defendant GREENBERG to originate either with defendant GREENBERG

or Soundscape.

286.    The false designation of origin is likely to cause consumer confusion.

287.    Plaintiff has been harmed by defendant GREENBERG's false designation of

origin.

288.    The foregoing acts and conduct by defendant GREENBERG constitutes false

designation of origin and passing off in connection with services provided in interstate

commerce, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

289.    Defendants' acts, as set forth above, have caused irreparable injury to plaintiff's

goodwill and reputation.  The injury to plaintiff is and continues to be ongoing and irreparable.

An award of monetary damages alone cannot fully compensate plaintiff for its injuries and

plaintiff lacks an adequate remedy at law.

290.    Plaintiff is entitled to a preliminary and permanent injunction against defendant

GREENBERG, as well as all other remedies available under the Lanham Act, including, but not

limited to, compensatory damages; treble damages; disgorgement of profits; and costs and attorneys' fees.

### THIRD CLAIM FOR RELIEF
### CONTRIBUTORY COPYRIGHT INFRINGEMENT
#### (Against Defendants Wilson, Dupuis, Echo Bay, and Greenberg Only)

291.     Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

292.     It cannot be disputed that the plaintiff has a valid, registered copyrights, and owns all rights to the Copyrighted Tracks.

293.     Defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS played a significant role in the direct infringement committed by others.

294.     Defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS knowledge of the infringing activity defendants OUTPOST, POULIN, third-party Sports Distributors of Canada Ltd., and others.

295.     Defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS materially contributed to the infringing activity of OUTPOST, POULIN, third-party Sports Distributors of Canada Ltd., and others.

296.     As a direct and proximate result of defendants GREENBERG's, ECHO BAY's, WILSON's, and DUPUIS's contributory infringement of plaintiff's exclusive rights to the Copyrighted Tracks as set forth in Section 106 of the Act, plaintiff has incurred damages, and requests an award of defendants' profits in excess of plaintiff's compensatory damages, and plaintiff's losses, plus costs, interest, and attorneys' fees.  Plaintiff may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement/reckless disregard for each U.S. Copyright Registration of up to $150,000, but not less than $30,000.

## FOURTH CLAIM FOR RELIEF
## VICARIOUS COPYRIGHT INFRINGEMENT
### (Against Defendants Wilson, Dupuis, Echo Bay, and Greenberg Only)

297.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

298.    It cannot be disputed that the plaintiff has a valid, registered copyrights, and owns all rights to the Copyrighted Tracks.

299.    Defendants played a significant role in the direct infringement committed by others.

300.    At bar defendants OUTPOST, POULIN, and third-party Sports Distributors of Canada Ltd. each directly infringed one or more of the Copyrighted Tracks.

301.    Each of the defendants had the right and ability to supervise or control the infringing activity of OUTPOST, POUIN, and Sports Distributers.  In fact, defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS controlled the direct infringements by defendants OUTPOST, POULIN, and third-party Sports Distributers.

302.    Defendants GREENBERG, ECHO BAY, WILSON, and DUPUIS directly profited from the infringements.

303.    As a direct and proximate result of defendant's vicarious infringement of plaintiff's exclusive rights to the Copyrighted Tracks as set forth in Section 106 of the Act, plaintiff has incurred damages, and requests an award of defendants' profits in excess of plaintiff's compensatory damages, and plaintiff's losses, plus costs, interest, and attorneys' fees. Plaintiff may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement/reckless disregard for each U.S. Copyright Registration of up to $150,000, but not less than $30,000.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF DMCA OF 1998, AS AMENDED,**
**17 U.S.C. §§ 1201, et seq.**
**(Against All Defendants)**

304.     Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth at length here.

305.     Section 1202 provides in part: (b) No person shall, without the authority of the copyright owner or the law - (1) intentionally remove or alter any copyright management information, [or] (3) distribute . . . works [or] copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.  17 U.S.C. § 1202(b).

306.     The DMCA states: "Definition.—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work: (1) The title and other information identifying the work, including the information set forth on a notice of copyright. (2) The name of, and other identifying information about, the author of a work. (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright. (4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work. (5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer,

performer, or director who is credited in the audiovisual work. (6) Terms and conditions for use

of the work.  (7) Identifying numbers or symbols referring to such information or links to such

information. (8) Such other information as the Register of Copyrights may prescribe by

regulation, except that the Register of Copyrights may not require the provision of any

information concerning the user of a copyrighted work." 17 U.S.C. § 1202(C); S.Rep. No. 105-

190 (1988), note 18.

307.    Plaintiff always distributes the Copyrighted Tracks with copyright management

information ("CMI") including the title, author, label, and copyright owner.

308.    Defendants could not have obtained a copy of the master recording for the

Copyrighted Tracks without this information.

309.    Master recordings are tightly controlled by plaintiff to prevent unauthorized

commercial use – like the Infringing  use at issue here.

310.    A master recording is an authenticated and unbroken version of a musical

recording (typically 96 kHz / 24 bit) with the highest-possible resolution—as flawless as it

sounded in the mastering suite.

311.    Defendants' infringing advertisements are synchronized to a very high-resolution

copy of the Copyrighted Tracks.  This high-resolution version cannot be obtained without the

CMI being included.

312.    Defendants removed plaintiff's CMI, and copied, synchronized, publicly

displayed, and/or distributed the Copyrighted Tracks.

313.    Defendants failed to include any information which identified the Copyrighted

Tracks, the author of the Copyrighted Tracks, the owner of any right in the Copyrighted Tracks,

or information about the terms and conditions of use of the Copyrighted Tracks.

314.    Defendants continued to publicly display the infringing advertisements with no attribution after YouTube, plaintiff, and plaintiff's counsel repeatedly informed defendants that the Copyrighted Tracks belonged to plaintiff.

315.    Defendants violated the DMCA each time they wrongfully distributed the infringing  advertisements.

316.    Defendants did the forgoing with the intent to conceal the infringement.

317.    Plaintiff seeks award of statutory damages for each violation of Section 1202 of the DMCA in the sum of $25,000.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendants, and awarding plaintiff as follows:

1.    restitution of defendants' unlawful proceeds;

2.    compensatory damages in an amount to be ascertained at trial;

3.    statutory damages to plaintiff according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

4.    an award of statutory damages for each violation by defendant of the DMCA, 17 U.S.C. § 1202;

5.    reasonable attorneys' fees and costs (17 U.S.C. § 505);

6.    pre- and post-judgment interest to the extent allowable; and,

7.    such other and further relief that the Court may deem just and proper.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: September 24, 2020             **GARBARINI FITZGERALD P.C.**
       New York, New York

By: _Richard M. Garbarini_

Richard M. Garbarini (RG 5496)